238 N.J. Super. 132 (1990)
569 A.2d 288
SHADOW LAKE VILLAGE CONDOMINIUM ASSOCIATION, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
PHILLIP ZAMPELLA AND PAMELA B. KING, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted November 22, 1989.
Decided January 24, 1990.
*133 Before Judges KING, BAIME and KEEFE.
*134 De Bona & Johnson, attorneys for appellant (Prospero De Bona, on the brief.)
Phillip Zampella and Pamela B. King, respondents, filed a letter brief pro se.
The opinion of the court was delivered by KEEFE, J.A.D.
The issue presented on appeal requires an interpretation of the age exemption clause contained in the master deed of an adult condominium community. Plaintiff, Shadow Lake Village Condominium Association, Inc. (Village), filed a complaint in the Chancery Division against defendants, Phillip Zampella and Pamela King, seeking injunctive relief in an effort to enforce the age restriction covenant of the master deed governing plaintiff's adult community. Plaintiff alleged that King and her 12 year old child resided in the Village in violation of said covenant. The matter was tried to a judge without a jury resulting in a judgment dismissing the complaint. The Village now appeals from that decision and we affirm.
Plaintiff is an adult community located in Middletown. The development is comprised of 952 residential units housing nearly 2000 residents and is situated on 75 to 100 acres. Surrounded by a fence and a large lake, the community has only one means of ingress and egress, a main entrance guarded by a security force.
The master deed was recorded in the Monmouth County Clerk's Office and includes a restrictive covenant governing the age of permanent residents. The covenant in pertinent part states:
That in order to preserve the character of this Condominium as an adult residential community, anything to the contrary herein notwithstanding, occupancy of all units shall be restricted as follows.
Permanent residents must be at least 52 years of age, except that the spouse or an immediate member of the family other than a child of said permanent resident, or a live in domestic, companion or nurse, may be a permanent *135 resident regardless of his or her age. A maximum of one child age 18 or older may also reside as a permanent resident with his or her parent or parents.
The foregoing occupancy restrictions shall not be construed to prohibit the occupants of any of the family units from entertaining guests, of any age, in their units, including temporary residency not to exceed three months. Full time occupancy in any event, however, shall be limited to three occupants. Any person or persons who may obtain legal or equitable title to a dwelling unit in this Condominium by way of purchase, gift, devise, testamentary disposition or by operation of law, or by any other means, and who does not fall within the category of permissible occupants as set forth above shall not be permitted to occupy any such unit. [Emphasis added.]
In early August, 1987 King began residing in the Village in a unit owned by Zampella. Zampella had acquired title to the condominium by a deed from King. Appended to the deed is a memorandum acknowledging the protective age covenant. Both King and Zampella are divorced.
Zampella is 56 years of age; King is 46 years old. While defendants are not married, they have a "close relationship." On occasion King has referred to Zampella as her husband.
King's daughter is 12 years of age and, under the protective age covenant, is restricted from residing in the Village. After residents complained about an underage child residing in the Village, King was informed by letter and telephone that her daughter was prohibited from living there. King responded by explaining that the child was not residing in her unit but was only a frequent visitor. Plaintiff arranged for surveillance of the condominium unit with the intention of ascertaining whether King's daughter resided there as a permanent resident. The surveillance was conducted by plaintiff's security force under the supervision of the manager of the Village. The surveillance was done by Barry Wilson, a retired policeman, who was plaintiff's head of security. Based upon Wilson's report, the manager of the Village concluded that King's child was living there on a permanent basis.
The manager then arranged for the surveillance of Zampella. That surveillance was also conducted by Wilson. After reviewing Wilson's reports, the manager concluded that Zampella was not residing in the unit but, instead, was only a visitor. According *136 to Wilson's logs, Zampella was absent from the unit 90% of the time.
Wilson testified at trial that he knows and recognizes both King and her daughter. Wilson's surveillance techniques consisted of entering the arrival and departure times of the child in a log book. Zampella's presence was monitored by Wilson and his guards who periodically patrolled the area of the condominium to determine whether Zampella's cars were there. However, on cross-examination, Wilson agreed that it was possible to enter and leave the Village without causing an entry in the log. He further conceded that it was possible that Zampella could have been driving King's car and gone unnoticed.
A neighbor of the defendants testified that he observed King's daughter in the condominium two or three times a week. He also stated that he witnessed her arriving at the unit from school almost every evening. His observations were made from his sun porch which provided him with a view of defendants' kitchen window.
King's mother testified that she resides in Red Bank and that on her frequent visits to the condominium she observed Zampella as well as his personal effects in the unit. She also testified that King's daughter lived with her in Red Bank, that the child had her own bedroom, and that she played a substantial part in raising the child. According to King's mother, the child attended school in Red Bank and the school has her home and work phone numbers and is instructed to call her in the event of an emergency. Under cross-examination she stated that her granddaughter occasionally spent three nights a week at the Village.
King's daughter testified that she lives with her grandmother and that she normally walks or rides her bike to school but in the event of rain is driven by her grandmother or grandfather. She further explained that she frequently visits King at the Village and that when she stays overnight she is either driven to school by King or she takes a bus. The child indicated that *137 she stays with King once or twice a week on the average. On those nights when she visits and has dinner with her mother, she remains until 11 p.m. and then returns to her grandmother's home in Red Bank.
King testified her daughter slept in her unit approximately two times a week and would visit her after school for a "couple" of hours. Additionally, she conceded that the child is a frequent visitor who maintains a regular presence in the Village. Zampella also said the child was at their home two or three nights a week.
On cross-examination Zampella stated that his automobiles were located at his apartment in Oakhurst when they were not in use. He insisted that the apartment in Oakhurst was not his place of residence and that his home address was in the Village. While he testified that he was registered to vote at the Village address, a certificate signed by the Monmouth County Supervisor of Elections revealed that he was registered to vote from the Oakhurst address as of June 30, 1988. Defendant Zampella admitted that he submitted a change of address card to the Board of Elections three or four weeks before he testified. He also claimed that he spent 99% of his nights at the Village.
Based on this testimony the trial judge determined that King was qualified to reside in the Village as Zampella's "companion." He further found that King's daughter was not a permanent resident of the Village.
Because King is not 52 years old, whether she can remain in the Village as a permanent resident required two factual determinations: 1) that Zampella was a permanent resident and 2) that King was a "companion" within the meaning of the exemptions contained in the master deed. Plaintiff correctly observes that the trial judge did not make any specific finding concerning Zampella's residency. The evidence produced at trial clearly created a genuine factual dispute concerning Zampella's status as a permanent resident of the Village. Since that *138 determination was critical to the issue before the trial judge, a specific determination by the trier of fact was necessary.
A trial judge must make fact findings which are sufficiently clear and complete to permit appellate review. R. 1:7-4; Katz v. Township of Howell, 67 N.J. 51, 63, 335 A.2d 14 (1975); In re Plainfield-Union Water Co., 11 N.J. 382, 396, 94 A.2d 673 (1953). If the trial judge fails to adequately fulfill this obligation the reviewing court ordinarily must remand so that the trial judge may render a proper decision on the critical factual issue. Katz, 67 N.J. at 63, 335 A.2d 14.
However, we are advised in King's appellate brief that she has terminated her relationship with Zampella. She argues that the question of his residency is now moot. King now asserts that she is "living at the complex with a gentleman who clearly fits all the criteria set forth in the Association's [master deed]." Because her representations are uncontested, we see no point in remanding the matter for a determination of Zampella's status.
Nonetheless, the change in circumstances does not entirely moot the appeal. We perceive that King's status as an underage permanent resident will remain as an issue between the Village and King regardless of whether Zampella or some other person satisfies the 52 year old age requirement. The resolution of the issue concerning King's status will guide plaintiff in any future actions directed toward her and others in similar circumstances.
On the issue of King's status, the trial judge said:
I'm sure if you looked in the dictionary, companion isn't restricted to friends of one's sex. You could have companionship. As a matter of fact, there are some elderly relationships where they have a certain amount of companionship. You can't just add a good friend, but not of the same sex, to the word companion because the term is broad.
Plaintiff asserts that the trial judge's conclusion "distorts the meaning of the word `companion' and is a torturous [sic] frustration of the intent of the covenant." Plaintiff maintains that when "companion" is read in the context of the master deed, its only reasonable interpretation is that it refers to a person who is "not quite a `nurse' or a `domestic'" but someone *139 who is "charged with the same duties and objectives: to serve and care for the primary residents of the unit." King responds by arguing that "companion" should be broadly construed to include the relationship which she and Zampella chose to maintain.
The provisions of a master deed are of paramount importance when defining the rights and obligations of condominium unit owners. Courts at Beachgate v. Bird, 226 N.J. Super. 631, 639, 545 A.2d 243 (Ch.Div. 1988). When construing a restrictive covenant, the court often examines the circumstances surrounding its creation. Javna v. D.J. Fredricks, Inc., 41 N.J. Super. 353, 358, 125 A.2d 227 (App.Div. 1956). While courts generally apply the rule of strict construction when dealing with restrictive covenants, this rule should not be used to defeat the obvious purpose of the restriction. Bruno v. Hanna, 63 N.J. Super. 282, 287, 164 A.2d 647 (App.Div. 1960). Further, absent "explicit indication of a special meaning" words must be given their ordinary meaning. In re Barnert Memorial Hosp. Rates, 92 N.J. 31, 40, 455 A.2d 469 (1983). The word companion is a broad word connoting a wide range of relationships. For example, synonyms of companion are "partner," "associate," "confrere," "comrade," "friend," "consort," "colleague," and "mate." Roget's Thesaurus 270 (1946). When the meaning of a word is unclear, its meaning "may be determined by reference to [its] relationship with other associated words and phrases." 2A Sutherland Stat. Const. § 47.16 (4th ed. 1984).
Here the word "companion" is used in a rather long phrase addressing exemptions to the age requirements for permanent residents in the Village. Those excepted from the age restrictions are: "spouses," an "immediate member of the family other than a child," a "live-in domestic," a "companion" and a "nurse." Thus, contrary to plaintiff's argument, the meaning of "companion" must be ascertained in the context of all the exempt class and is not restricted by the nouns that immediately precede and follow it in the phrase. In that context, a companion would include a person who is not a *140 spouse but who lives with a permanent resident in that type of relationship. Moreover, beyond the wording of the clause itself, we find nothing in the master deed provisions that evidence an intent to exclude couples living together, either of the same or opposite sex, so long as one permanent resident is 52 years of age. Indeed, plaintiff could not very well argue under the wording of the master deed that King could be barred from the Village if she was 52 years of age simply because she was living with a male permanent resident in a non-traditional relationship. Certainly using the word "companion" to describe such a relationship would be appropriate. That being the case, we find no rational reason for excluding King from permanent residency simply because she is less than 52 years of age and a "companion" as opposed to a "spouse" of the permanent resident satisfying the age restrictions.
As pointed out by the trial judge, plaintiff had the burden of proving that the master deed excluded King. We agree with the trial judge that grammatical construction of the master deed, standing alone, does not satisfy that burden of proof. Plaintiff offered no testimony concerning the circumstances surrounding the drafting of exemptions when the deed was adopted. Thus, the trial court was deprived of the opportunity to examine the circumstances surrounding its creation. See Javna, 41 N.J. Super. at 358, 125 A.2d 227. We conclude, as did the trial judge, that the ambiguity must be resolved in favor of King.
Lastly, the Village contends that the evidence does not support the trial judge's findings that King's daughter is not a permanent resident of the Village. On this point the trial judge stated:
I'm not satisfied that the girl, by a preponderance of the evidence, meets the requirements of a permanent resident. That simply is not there.
So I will deny any relief by way of injunctive relief against [the daughter] visiting. I cannot enjoin her from being a permanent resident because I'm not satisfied that there is proof that she is a permanent resident. So I will leave that situation alone and not touch it.
Findings of a trial judge are binding upon a reviewing court if "supported by adequate substantial and credible evidence." *141 Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974) (citing New Jersey Turnpike Auth. v. Sisselman, 106 N.J. Super. 358, 255 A.2d 810 (App.Div. 1969), certif. den. 54 N.J. 565, 258 A.2d 16 (1969)). Further, an appellate court must not "disturb the factual findings and legal conclusions of the trial judge unless [it is] convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id. (quoting Fagliarone v. Twp. of North Bergen, 78 N.J. Super. 154, 155, 188 A.2d 43 (App.Div. 1963)).
Giving appropriate deference to the trial judge's ability to assess the credibility of the witnesses, our review of the record reveals that his findings are amply supported by the evidence. While one may entertain a certain amount of doubt as to whether the child did in fact reside with King, the trial judge's findings are certainly not "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Id.
The judgment is affirmed.